746 So.2d 1117 (1999)
Robert KNIGHT, Appellant,
v.
Nancy Cash KNIGHT, Appellee.
No. 98-0422.
District Court of Appeal of Florida, Fourth District.
October 6, 1999.
Rehearing Denied January 7, 2000.
Jonathan S. Root of Graner, Root & Libow, P.A., Boca Raton, for appellant.
No brief filed on behalf of appellee.
WARNER, C.J.
Appellant, Robert Knight ("Husband"), appeals from a final judgment dissolving his marriage to appellee, Nancy Cash Knight ("Wife"), on the grounds that the trial court erred in imputing income to him, in calculating child support, and in ordering him to maintain a life insurance policy to secure the payment of child support for the minor children. While we affirm the imputation of income to the husband, we reverse the calculation of child support for failure to determine the amount of the husband's net imputed income. We also reverse the order requiring the husband to maintain a life insurance policy, due to the trial court's failure to ascertain its availability and cost.
The husband is a physician who specializes in sclerotherapy, which involves the treatment of veins. After the couple's marriage in 1983, they moved to Florida so that the husband could open his own medical offices. By 1989 the husband ran two offices called the Vein Care Center ("Center") and earned a yearly gross salary exceeding $100,000.
By 1990 the husband was taking home a gross salary in excess of one million dollars. Eventually, the husband expanded the Center operation and opened five additional offices, hiring staff and other physicians to handle the increased patient load. *1118 The husband financed this expansion with a $600,000 bank loan and a $300,000 line of credit. Unfortunately for the husband, in 1990 Medicare began reducing its reimbursements, which in turn caused a decrease in patients. As a result of the high debt and the decrease in patients, the business began to suffer losses by 1991. However, the husband was still taking home a gross pay of $650,000. By October of 1991, he began to close some of the offices. Once the offices began to close, the other physicians and assistants also left the Center.
By September of 1992, the Center was in a dire financial position and was forced to file bankruptcy. As a result of the Center's bankruptcy, the couple was unable to maintain their own personal obligations, and they were forced to file for personal bankruptcy in January of 1993. During the proceedings, the bankruptcy court fixed the husband's salary at $150,000 for one year, which could increase to $225,000 the following year if the Center was meeting its financial obligations. During this time the husband was sued for malpractice by over one dozen patients. In addition, the Department of Professional Regulation was also investigating the husband for failure to properly supervise members of his staff who were not doctors.
Because the bankruptcy involved the Vein Care Center Corporation, the husband created a new corporation to re-establish his business and retained the three remaining offices under the new entity. By 1995, the husband's salary was $115,000, and the corporation's income stream for the first part of the year was stable. However, during the summer of 1995 the husband and wife separated, and coincidentally the corporation's income began to drop. The husband filed for dissolution of marriage in December of 1995, and the corporation began a downward spiral. By the end of 1996, the corporation had an annual net revenue of only $87,300 and as a consequence, bills remained unpaid. At the end of 1996, the husband closed the remainder of his offices. His financial officer testified that "[t]he business was operating fairly decently through the end of 1995, and it just continued to get worse during 1996."
Having filed for divorce at the end of 1995, the husband was also subject to orders for the payment of child support. At the time he closed his offices he was being threatened with incarceration for repeated failure to pay temporary awards. He told his financial consultant that he shut his business down for fear that he would be arrested in front of his patients for neglecting to pay child support. Despite that fear, he did not use any of his corporation's income to pay the child support in arrears. He also testified that after he closed his offices his employees continued to keep his files and he continued to keep a separate mailbox for the corporation, where he received additional monies.
It is unclear how much the husband earned in 1996 because although he received a small actual salary, the husband often took advancements which were not included on his W-2's and were not otherwise accounted for. The husband also terminated payment on his life insurance premiums in 1996 when the remaining offices were closed.
The husband remained unemployed until June 1997, when he got a job as a physician at Natural Health Institutes of America earning $37.50 per hour. At the time of trial, he was only working fifteen to twenty hours per week. He explained that he was only able to work a limited number of hours due to a lack of business. However, he was told that he would be given full-time work in the future. In addition, although he would be able to get health insurance through his employer, he would not receive any life insurance.
At trial, the past chief financial officer of Vein Care Center, Daryl Hall, who is a C.P.A., testified as an expert witness regarding the financial state of the company during his tenure. He testified that he *1119 had no idea how much the husband could earn, although he believed that the husband could not be self-employed both because of his prior financial problems and the high cost of his malpractice insurance. However, when pressed, Hall asserted that it is unlikely that the husband could reach the previous earning level because the Center still owes a great deal of money to creditors, and competition for that type of work is fierce. Nevertheless, he acknowledged that the physicians who had left the Center had very successful practices in other areas. Thus, an availability of patients still existed.
The wife was a registered nurse when the parties married. In February of 1995, the wife began working for the Boca Raton Community Hospital. At the time of trial, the wife was employed full-time earning approximately $47,000 per year.
The trial court ultimately found that the husband could earn an annual gross income of $250,000 based on the following: (1) the clinic had a monthly gross income between $97,349 in 1996 and $1,464,081 in 1995; (2) the husband admitted to voluntarily closing his offices to avoid the embarrassment of incarceration; and (3) the husband accepted a position as a physician earning a small salary which was inconsistent with his education and experience. As a result of the imputed income, the court ordered the husband to pay $3,237 per month in child support. The court also ordered the husband to maintain a life insurance policy in the amount of $250,000 to secure that obligation. The husband moved for and received rehearing as to the amount of child support. The trial court modified the final judgment as to child support and, based upon a recalculated child support guidelines worksheet, ordered the husband to pay $2,967.79 per month based upon the husband's net monthly income of $22,061.05. The instant appeal follows.
The husband complains that the trial court failed to make factual findings to support the imputation of $250,000 in income. We disagree. The court found from 1993 through 1996, that the medical practice earned the following yearly gross receipts: $1,442,106.27, $1,464,081.57, $1,334,403, and $935,319.61. The court also found that he voluntarily closed his practice and that he had made minimal efforts to obtain employment commensurate with his education and ability. The husband's income at the time of the divorce was significantly below his income history and did not reflect what he was reasonably capable of earning. Thus, the court simply found that the husband could make more money in his chosen medical career.
The court's judgment sufficiently identified the amount and source of imputed income and used the statutory criteria to determine the income level. See Viscito v. Menditto, 644 So.2d 135, 136 (Fla. 4th DCA 1994). Section 61.30(2)(b), Florida Statutes (1997), provides for the imputation of income and states, "[i]n the event of such voluntary unemployment or underemployment, the employment potential and probable earnings level of the parent shall be determined based upon his or her recent work history, occupational qualifications, and prevailing earnings level in the community...." While the husband argues that his prior level of income cannot be duplicated, we think the record supports the trial court's findings. Although the husband's financial officer testified that he doubted the husband could restart a new practice given his bankruptcy history and medical malpractice problems, the actual facts belie that assertion. Despite both of these factors, the husband was able to open a second practice in 1995 which grossed $1,334,000 the first year and appeared to be very stable and growing until the husband and wife separated, at which time the business began a downward spiral. As to his own income, the figures are sketchy since the husband took advancements without accounting for them. But during the second year of the bankruptcy of the first corporation, the court allowed *1120 the husband a salary of $225,000, and he was also entitled to some benefits. Thus, the court could infer that the husband's voluntary abandonment of his practice due to the divorce, rather than other factors, caused the business to fail and that $250,000 was a reasonable amount of gross income which could be imputed to him.
We agree, however, with the husband that the court below erred in calculating the amount of child support. A review of the child support guidelines worksheet in the record makes this miscalculation apparent on its face. First, the trial court added the husband's actual income together with his imputed income. This was incorrect, since the trial court found that he could make $250,000 per year, not $250,000 in addition to the approximated $30,000 he was currently making. Therefore, the total income should have been $250,000. Second, the trial court deducted only $1,075 for the husband's child support obligations from his first marriage, $116.03 for federal income tax withholding, and nothing for FICA or self-employment taxes which the husband must also pay. While it is not apparent where this figure came from, it could not have included an estimate of withholding and social security on an income of $250,000. We therefore reverse to recalculate the husband's net income, taking into account the mandatory deductions required under section 61.30(3).
Finally, we agree with the husband that the trial court erred in ordering him to maintain a life insurance policy to secure the child support award without having evidence of the existence of a policy or the cost thereof. See Hicks v. Hicks, 654 So.2d 654, 655 (Fla. 5th DCA 1995); Kremer v. Kremer, 595 So.2d 214, 218 (Fla. 2d DCA 1992). The husband is fifty years old and has recently had open heart and back surgery. Whether he can secure affordable life insurance is questionable. We therefore reverse and remand for the trial court to consider this issue.
Affirmed in part; reversed in part and remanded for proceedings consistent with this opinion.
SHAHOOD, J., and CHAVIES, MICHAEL B., Associate Judge, concur.